Good afternoon, your honors. Gabriel Galland on behalf of Doucette, in whose memory we honor today by use of his name, would like to reserve three minutes. May it please the court. The United States took final agency action at the request of a Washington DC lobbyist to advantage third-party racketeers on the same day of a hearing before this very court in this very courthouse. Then the United States hid the proof from Doucette and from the district court which deprived Doucette of an opportunity to challenge Interior's recognition decision as per se unlawful. As to Doucette's current claim, it is settled federal law, which includes Nooksack v. Zinke out of the Western District of Washington, that the secretary owes a responsibility to interpret tribal law when necessary to carry out the government-to-government relationship. More specifically, as Interior very recently advised the DC Circuit in reference to the agency's certification of a tribal election, quote, where the provision of tribal law, Interior must make its own judgment regarding how the tribe would likely interpret the provision of tribal law at issue. Here however, Interior styles its pledge to interpret Nooksack election law as a quote-unquote unique approach, feigning at page 27 of its response that it is quote-unquote never promulgated a policy that mandates when it must interpret tribal law. As we now know from its admissions before the DC Circuit in required Interior to interpret a pivotal ballot validation issue or at least explain why it did not. Interior... Council, what is it that you wanted DOI to do? We wanted DOI to interpret the tribal legal issue of how a ballot would be validated, whether by postmark or by voter signature or otherwise. And it simply quote-unquote declined to do so without explanation, which we maintain represents a change in policy. And we now know why Interior abdicated, Your Honor. That is because the record DeSette was forced to develop through FOIA shows that BIA's choice to quote-unquote decline to interpret tribal law on March 7th was intended to accelerate Interior's recognition decision hours later, precisely as the lobbyist requested, precisely when the lobbyist requested that decision be made. Interior's policy of when to interpret tribal law must be viewed against the backdrop of the trust responsibility owed to Indians. According to 25 U.S.C. 2, the Secretary of Interior shall manage all Indian affairs and all matters arising out of Indian relations. The Supreme Court has held that the duty owed to Indians is one of moral obligation of the highest responsibility of trust, one of exacting care, one to which national honor has been... Council, I want to come back to the question that I just asked you, and I want to ask it to you again. But I want to preface it by saying I'm looking at the letter of December 23rd, 2016, and it is clear that the Department of Interior has accepted tribal law. It certainly has interpreted tribal law in some ways. That is, it took the judgment of the intertribal court, but not the tribal council, because it regarded it as not having satisfied the quorum requirement. Both of those judgments, that is, that you don't have a quorum, is an interpretation of tribal council law. And the decision that it will recognize decisions by the Northwest Intertribal Court System indicates that in some respects it is doing so. It explains that it's doing it because of its government to government responsibilities. So I want to come back to that question again. Where precisely did you want DOI to get involved here? What did you want them to do? Your honor's correct. Interior did interpret tribal law. They also interpreted tribal law as to whether there was a county residency requirement to vote under the constitution, which you can see from all three Roberts determinations, Interior interpreted tribal law to suggest they did not. In affirming time after time that only a recognition of the tribal council would occur in accordance with Nooksack Tribal Law, we want the United States, as requested in our prayer for relief, to finally decide whether tribal law should have come to bear in deciding the recognition of the tribal council. Meaning, should ballots have been validated according to postmark or according to voter signature or by some other way that would then, in accordance with tribal law and therefore all five determinations, allow a recognition decision to be made in postmark? Did DOI accept the results from the election commission? They did, your honor. Well, isn't that a way of recognizing tribal law? No, the election commission never decided how a ballot would be validated, whether by postmark or whether by voter signature. Therefore, it was ambiguous, at least on the record presented by the election superintendent. But they also determined that it wouldn't affect the election and under their rules, if it wouldn't affect the election, it was irrelevant to decide certain questions. Well, how could it not affect the election, a decision as to how you will count a ballot, whether it requires a postmark? Because it said that they had some disputed ballots and said the number of those ballots would not change the result. That's correct, your honor. But the fundamental contention of Ms. Roberts was that to accept any ballot in an election that was supposed to be exclusively by mail, according to the Nooksack ordinance, that did not have a postmark was unlawful. That was presented to the election board, which you will see upon careful review of the tribal court record, was never decided. It remained, therefore, ambiguous when presented to the BIA. What you really want is you want a DOI to scrutinize this election. You want a DOI to spend more time, that is, to interfere more with inter-tribal affairs here. Well, first and foremost, this is not an interference with tribal affairs. It might be from DOI's perspective. That is, if they have to get in and make all the decisions in place of an election commission, that's a way of interfering with tribal affairs. Right, but that cannot be the contention of either the United States or anybody else when the matter of the election was delegated to the Secretary of Interior and the Secretary of Interior decided to get involved in the first instance in a matter what normally would not be involved. It then became a federal matter, not an intramural matter, not a matter of internal affairs. And in that case, you see, as admitted in Hudson, the United States has a policy of interpreting tribal law when it's making determinations at NOOCS Act. They said they would only recognize a governing body at NOOCS Act if it was done in accordance with NOOCS Act tribal law, therefore requiring it to interpret tribal law. But we disagree with the idea that this was an interference in tribal affairs because under the MOA, that was delegated to the Secretary and it normally would not otherwise have the responsibility to get involved. Do you want to tell me which document in particular has got a wrong decision from DOI? Which letter? Well, it's not the five determinations that constitute the policy. But if you look at the endorsement memo, ER0099, and in particular page 0102, the BIA said the question of whether ballots could be received by hand or whether all ballots had to be postmarked is one of tribal law. And the BIA declines to insert itself and interpret tribal law in this instance. But we now know they have a right to interpret tribal law. We also know, according to the policy at NOOCS Act, they assumed an obligation to interpret tribal law in order to recognize the governing body. By declining to interpret tribal law against both policies without explanation, as would be required for a policy change, was unlawful. Counsel, I think I'm now looking at the endorsement here. And the BIA on page 100 says it's aware of the complaints about irregularities. It's aware of the challenges to the election. That's page 101. And it has gone through a number of these objections. And it says the BIA finds the appeals process occurred according to Title 62 set forth in the MLA. No indication the appeals process was marked with any improprieties. What's wrong with that? Well, they then go on to say it is vitally important to decide how a ballot is to be validated at NOOCS Act. They, however, simply demurred. They declined to render that interpretation without explanation. Give me the, can you give me a paragraph? I'd love to see, I'd love to see exactly where you think the secretary made a mistake. Yes, it's in ER 102, Your Honor. Okay, which paragraph? I'm on it. Give me one second. First paragraph, second full line from the bottom. Ultimately, the question of whether ballots could be received by hand or whether all ballots had to be postmarked is one of tribal law and the BIA declines to insert itself and interpret law in this instance. Again, there was no explanation as to why they deviated from the policy we now know from Hudson or the policy. Counselor, you ought to read the very next sentence. The evidence before the BIA indicates that the election was conducted in a proper manner and the BIA finds nothing to disturb the board's conclusions. What's wrong with that, counsel? Fundamentally, there was no decision rendered as to how a ballot would be validated. There is no evidence whatsoever. Do you want more explanation as to why the BIA finds nothing to disturb in the board's conclusions? I want an explanation as to why the BIA declined not to interpret tribal law as to whether a ballot required a postmark in what was supposed to be an exclusive mail-in election or whether there were alternatives such as a voter signature. But as it stands, there was no conclusion rendered whatsoever by either the election board or the BIA as to how a ballot would be validated. There is zero evidence in the record that decision was ever made. You have an election that therefore has no ability to be validated or certified by a tribe or the federal government in any way that would make sense in any sense of a normal election. And for that reason, within within the tribe, in an ordinary election, does the BIA get down to this level of granularity? Normally, the BIA does not at all get involved in an election, Your Honor. So ordinarily at the Nooksack, who would make these decisions? The election board. Did you have an election board? We did. That was my recollection, too. It was chaired by a superintendent. The BIA asked to be removed for conflict of interest. But there was a board that never reached this decision. Again, there is zero evidence in the record that any ballot was validated according to tribal law, and it was therefore left to the BIA as trustee under the MOA to do that. And they simply refused. And now we know why they refused, Your Honor, because in demurring on March 7th, they were allowed to then accelerate a recognition of a decision by March 9th when this court was in proceedings to advantage third party racketeers. And they simply cannot change the policy either announced in Hudson or at Nooksack without an explanation. So at a minimum, Your Honor, they needed to explain why they declined to interpret tribal law in this instance, and they simply refused. And we know they refused because they had an ulterior motive in refusing to do so and an ulterior motive in recognizing the governing body at Nooksack. With that, Your Honor, I'd like to reserve the rest of my time for rebuttal. Okay. Mr. Kipnis. Thank you. Please, the Court, Brian Kipnis, Assistant United States Attorney representing all of us here. I want to address first this notion that the Hudson brief filed by the Department of Interior has any bearing on this particular appeal. The candidates brought that particular brief to the court's attention pursuant to a 28-J letter on the eve of this hearing. It's not been brought to the court's attention before. I would submit, Your Honor, we filed a response to that today, that that is improper to refer to a brief as opposed to something that's specifically an authority in a 28-J letter. But the thing that, and Your Honor, I'd love to give you a longer response to this argument than my 350-page limit under Rule 28-J, but let me say this. The case at issue in Hudson concerns what's called a secretarial election. A secretarial election is a specific statutory proceeding in which the Department of the Interior is statutorily required to run an election. So it's an election not by a tribe. It's an election that the statute puts specifically to the responsibility of the Secretary to run. In the statute, there are specific references that basically say that the Secretary in that situation is supposed to apply appropriate law. Two subsections in the statute specifically direct the Secretary to apply appropriate law. So in that instance, Your Honor, certainly in the context of a secretarial election, which the proceedings at Nooksack were not, the Secretary is correct in applying appropriate law. But the other important point is there's nothing inconsistent about what the Department of the Interior said in the Hudson brief than the position we've taken here. Of course, we recognize there are appropriate times for the Secretary for the purposes of the Department to apply tribal law or to try and understand tribal law in order to reach a determination. Never been our position at any time in this case that it's not appropriate for the Department to do so. What the other side is advocating here is to say there is a policy that requires in every circumstance that the Department of the Interior apply law and that there isn't some notion that the Department can apply discretion when it needs to consider tribal law or when it doesn't. This was a circumstance in which it didn't. To say that the Tribal Election Board didn't make a determination on this is fantasy. The Tribal Election Board looked at the complaint made by the candidates and other persons at Nooksack and decided, number one, that the one ballot that was brought to the attention of the Elections Board that was allegedly inappropriately received was a replacement ballot and that those can be received by hand by the Nooksack tribe, notwithstanding other provisions of the Nooksack, there was also a complaint that the ballots were being received by some individual, what was referred to as an election party or something like that. The Nooksack clarified that the person who was receiving the ballots was a Postal Service employee who was receiving the ballots there on behalf of the Postal Service. Now, one can argue whether that seems strange or not, but the most important consideration in the Election Board's determination, which was the one that seemed to be the one that the department was most persuaded by, was that even if the number of ballots that were supposedly improperly received by the Elections Board were counted in favor of these candidates, it wouldn't have made a change in the election. It wouldn't change the result. And so that is the reason here why it was unnecessary for the department to step beyond its bounds and make some sort of authoritative determination of what the Nooksack election code meant, because it wasn't necessary to do that. It looked at the ballots and saw that all the ballots were accounted for and that it seemed to be a fair election according to the tribal code. And that's all that they indicated that they were going to do in the four letters, the to make sure that the election was consistent with the Nooksack code, with the relevant appellate court decisions. And basically what the department determined is, yes, this was consistent with the election code. The challenges were appropriately disposed of by the Election Board of the Nooksack tribe. And so in this particular circumstance, we don't need to make a determination on this election code for the Nooksack tribe. Nooksack tribe is its own government. It's perfectly capable of making those decisions for itself. There's no reason for the department to weigh in and tell the Nooksack tribe and the challengers what the Nooksack elections code means. The reason that the department looks to the code is to make decisions for itself as to what government is appropriate to recognize, whether in a secretarial election it's approve an amendment of a tribe's constitution. Yes, there are circumstances in which it is appropriate for the Department of Interior to take tribal law into consideration. It just wasn't necessary in this circumstance. And no policy required it. The notion that there's some policy out there that requires it is just there's been no evidence of it. And as the law of the circuit directs, if there is a policy that's to be a substantive policy, it needs to be promulgated in accordance to a congressional direction. None of that is present here. And council doesn't even deny that. There's no regulation. There's no manual. There's no handbook. There's no order. Nothing tells the department that it was required to make a determination of what Nooksack election law provided in this particular circumstance. The law of the circuit is clear when that's the case. There's no violation of the of the APA because there's nothing that is has the force and effect of law that can create a violation for purposes of the APA and allow the district court to judicially review whether the department acted arbitrarily or capriciously. So from our perspective, your honor, there's nothing for the there was nothing for the court to review on the APA. And that's what the district court decided. And nevertheless, the district court did look further than we thought was necessary to how the department and the Bureau of Indian Affairs conducted themselves in their monitoring of this election, which they weren't required to do, but they did do. And the district court specifically complimented the department on how it handled those duties and basically was convinced the department carried out its duty to make sure that this election was free and fair. And it was. And so, your honor, there's no APA violation here. The other point that opposing counsel made is that there's been some reversal of policy. There's no showing that there's been any reversal of policy. There's no showing that there's been a policy in the first place. Even assuming there was a policy, there's nothing that counsel has pointed to that prevents the department. Look, this was an unusual circumstances at Nooksack. Everybody understands that and everybody understands that it was unusual for the to this extent in this particular circumstance. But they did. And they were adapting to the situation that was presented at Nooksack. And so in this particular instance, reviewing this particular dispute, the department decided that it did not need to apply, did not need to resolve this question, this technical question of Nooksack election law. That doesn't represent a change in policy. That represents an appropriate response to a unique set of circumstances. There's nothing that counsel has pointed to that prevents the department from doing that. And there's nothing to say that that's some kind of reversal of policy. This is a sui generis situation and the department reacted to it. Absence of showing that that violated something that's promulgated, that's a perfectly appropriate thing for the department to do, to react and adapt to a particular set of circumstances. I want to address to your honors the indispensable party argument. I think in this circumstance, the district judge did decide that the Nooksack Indian tribe was not an indispensable party. However, the district court in this circumstance had what we believe is an inappropriate representation by the candidates here that they weren't trying to set aside. Recognition of the counsel by the Department of the Interior, that is precisely what they were seeking as soon as they were passed the motion to dismiss. But I think that what the district court said was DOI is perfectly capable of doing this. And once you get into the necessary party, you've got questions of sovereign immunity and other things. And as long as the Department of Interior is in here, what we really were doing was was just deciding whether whether your actions were arbitrary and capricious. And for that, we don't need to try. That and that is I think that that would be the absolutely correct way to look at this before Dine Citizens and the Jamal action case. But both of those recognize that where there's a specific adverse effect on a legally protected interest to the tribe, then maybe you need to look at it differently. And that's particularly the situation here. As to whether as to whether it be a useful party is something else or if it would be really, you know, really terrific to have them in the case if we could get them. But as to whether you find that you cannot proceed in their absence is a much, much stricter standard. That's true, Your Honor, but if you think of the consequences of taking away recognition of this council, that the government to government relationship with the Department of Interior, the consequences would be quite severe. And so is the tribe willing to waive its sovereign immunity or does the case go away because we can't get them before the court? The latter. I have no information that the tribe would be interested in waiving the sovereign. There's no way for them even to claim that DOI has acted arbitrarily and capriciously under the APA because they can't get the tribe before the court. Correct. I believe that's what the case will be run in these circumstances, these circumstances where there's a significantly adverse impact on the tribe, where it's going to affect the tribe going forward. What if DOI had done something that was just clearly contrary to its regulations? Then the Doucette would just be out of luck here? Under the circumstances where these three elements apply, that's what the case is that precedes it. Even though it's quite apparent that the secretary's actions were just outright arbitrary and capricious and otherwise contrary to law within the meaning of 5 U.S.C. 706. There would be no remedy there. I think that that is basically the thrust of Dye Citizens and Jamal Action. In both of those cases, the plaintiffs would contend that they should have been able to carry their cases forward, but without the tribe in the case, they were not able to. No different here, Your Honor. Moving on, also, I wanted to address the remedy because I think that was what you were talking to Judge Biden. I wonder about the remedy, too, because the remedy that they seem to be seeking is not one that would be a remedy that would solve anything here. If you remove the government-to-government relationship of this tribal council with the government, how does that remedy the harm that plaintiffs have suffered? It doesn't give them a new election. It doesn't put them in elective office. All it does is create chaos for the tribe and seemingly chaos for the sake of chaos. So, in that sense, it seems particularly vindictive. There's no remedy here that seems to be one that is suitable under the circumstances because the district judges you recognized couldn't force the Nooksack tribe to give the candidates a new election because they're not in the case. You can't force the tribe to put them in office because, again, they're not in the case. So, it's hard to understand how the remedy that the candidates here are seeking solves anything other than just to create chaos for the Nooksack Indian tribe. Lastly, Your Honor, I wanted to address the second appeal and whether there's any jurisdiction. We think the court has squarely decided that the decision of the district court not to entertain, not to grant the indicative motion and to entertain a Rule 60B motion from the candidates is not jurisdictionally appealable to this court. And the two cases that I've cited in my brief seem to stand for that. And also, Your Honor, we don't believe there was any abusive discretion in that decision not to grant the indicative appeal motion or to grant the motion for reconsideration. So, if there's no questions, Your Honor, I'll submit. Thank you, counsel. Rebuttal? Thank you, Your Honors. First, the suggestion made by the United States that somehow Doucette pulled a bait and switch before the trial court drips with irony on the record before this particular court. The trial court, in its minute order at footnote four, made very clear it looked to the prayer for relief announced by the plaintiffs, which is to have the recognition decision set aside under Section 702 as arbitrary and capricious, or compel the United States to interpret tribal law as the relief it was seeking. And to be clear, Your Honors, Doucette has been consistent with that request for relief throughout this litigation. Mr. Kipnis argues exactly the opposite thing he argued on behalf of the United States in Doucette versus Zinke, is that at the time the MOA was entered into, or the recognition decision was reached, that the Nooksack tribe was a legitimate government capable of managing its own affairs. It decidedly was not a legitimate government. It had a holdover counsel, and the United States recognized that, as did Judge Kugenhauer in Doucette versus Zinke. There was in fact a policy, as recognized under McCarty, Morton versus Richardson, Ruiz and Alcarez by this court, a policy where through a course of conduct, as we see through five determinations rendered over 18 months, the United States said it would not recognize the Nooksack governing body unless and until an election was fulfilled in accordance with Nooksack law. That required the United States to decide how to validate a ballot. And at our opening brief at page six, Your Honors, we recite the tribal law at issue, which said voting shall be conducted entirely through the United States Postal Service, only ballots postmarked at or before the close of polls on election day shall be counted. Evidence was presented where non-postmarked ballots were filed. It required the United States then, in accordance with its policy, to look at that provision, decide whether it was ambiguous or not, and make a decision as to how to validate a ballot. Again, there is zero evidence that any consideration whatsoever was given by the Department of Interior Assistant Secretary as to how to validate a ballot and ultimately to certify an election. Finally, the Nooksack tribe is not indispensable or required, Your Honor. They ceded that right when the tribal chairman authorized the department of Interior to conduct the election. This is not Hamul, where the integrity of the tribe was under siege. This is not Diné citizens, or Navajo Nation, both as regulator of mining operations at Navajo would have had mining opportunities enjoined without them. As to a remedy, Your Honor, it's important to recognize this is not just about election or voting rights. You can look at all five determinations, starting with the Larry Roberts determination in October of 2016, carrying forward to the John Tasuda determination of January, 2018. They all concerned direct services, citizenship rights, housing rights, or benefits of tribal membership, according to the MOA Section E. Those remedies remain alive as it relates to Deset, or at least the living plaintiffs. Finally, Your Honor, we ask that you consider remanding this matter directly to DOI, as was the case in Alcoraz, as has been the case in other matters where DOI did not do what it said it would do or what it was required to do, which was interpret tribal law for purposes of recognizing a governing body. You have the authority to remand directly to the agency, which has the expertise to do what it said it would do, and to now do what it must do. Thank you, Your Honors. Counsel, before you conclude, we received a suggestion of death on the record. Yes, Your Honor. What does that do to this case? Nothing, Your Honor. Robert Deset, what's that, why? First, Your Honor, there are three living plaintiffs, including Mr. Deset's wife and daughter, who remain aggrieved by the decision. And secondly, Your Honor, again, this is not about just election or voting rights. It's about direct services, federally funded direct services like housing and healthcare, which are still in controversy at Nooks Act. Do you anticipate that there would be a personal representative appointed to continue on behalf of Mr. Deset or that the remaining plaintiffs will just carry forward? I don't know, Your Honor. Candidly, in respect for the family, that's not a question I saw fit to pose given the circumstances of his passing. I do understand the rule requires me to pose that question. And as soon as the time is right, I will do so. But at a minimum, the remaining plaintiff appellants are prepared to proceed in his stead. All right. There will be an order forthcoming to get the answer to that question. So just to alert you that something will need to be done. And of course, we convey our sympathies to the family on the loss of their loved ones, their loved one. Thank you, counsel. Case just ordered is submitted for decision by the court. Now, the final case on calendar for argument is Peterson versus Port of Benton County et al.
judges: Rawlinson, Bybee, Moskowitz